1 | **REMY MOOSE MANLEY, LLP**
2 | HOWARD F. WILKINS III, SBN 203083
LOUISA I. ROGERS, SBN 348350
3 | 555 Capitol Mall, Suite 800
Sacramento, California 95814
4 | Telephone: (916) 443-2745
Facsimile: (916) 443-9017
5 | Email: cwilkins@rmmenvirolaw.com
Email: lrogers@rmmenvirolaw.com
6 |
7 |
Attorneys for Plaintiff
8 | YUBA COUNTY WATER AGENCY

9 |
UNITED STATES DISTRICT COURT
10 | EASTERN DISTRICT OF CALIFORNIA

11 |

12 | YUBA COUNTY WATER AGENCY,

13 |         Plaintiff,

14 | v.

15 | NATIONAL MARINE FISHERIES SERVICE; | **YUBA COUNTY WATER AGENCY'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
UNITED STATES DEPARTMENT OF
16 | COMMERCE; HOWARD LUTNICK, in his
official capacity as Secretary of Commerce;
17 | JENNIFER QUAN, in her official capacity as
Regional Administrator of the West Coast Region
18 | of the National Marine Fisheries Service; U.S.
ARMY CORPS OF ENGINEERS;
19 | LIEUTENANT GENERAL WILLIAM H.
"BUTCH" GRAHAM, JR. in his official capacity
20 | as Commanding General of U.S. Army Corps of
Engineers; and COLONEL ROBERT M.
21 | McTIGHE, in his official capacity as
District Commander, Sacramento District, U.S.
22 | Army Corps of Engineers,

23 |

24 |         Defendants.

25 |

26 |

27 |

28 |

## INTRODUCTION

1.      Plaintiff Yuba County Water Agency ("Plaintiff" or "YCWA") brings this lawsuit under the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706, against Defendants National Marine Fisheries Service ("NMFS," also known as "NOAA Fisheries"); U.S. Department of Commerce ("DOC"); Howard Lutnick, in his official capacity as Secretary of Commerce; Jennifer Quan, in her official capacity as Regional Administrator of the West Coast Region of NMFS; U.S. Army Corps of Engineers ("USACE" or "Corps"); Lieutenant General William H. "Butch" Graham, Jr., in his official capacity as Commanding General of USACE; and Colonel Robert M. McTighe, in his official capacity as District Commander, Sacramento District, USACE (collectively, "Defendants").[1]

2.      As explained more fully in this Complaint for Declaratory and Injunctive Relief ("Complaint"), Defendants violated the ESA and APA in connection with NMFS's Biological Opinion issued July 30, 2024 ("2024 BiOp") for USACE's operations and maintenance of existing fish passage facilities at Daguerre Point Dam on the lower Yuba River, near Marysville, California ("Proposed Action").

3.      The 2024 BiOp concluded that the Proposed Action would jeopardize the continued existence of the Central Valley ("CV") spring-run Chinook Salmon Evolutionarily Significant Unit ("ESU"), California Central Valley ("CCV") steelhead Distinct Population Segment ("DPS"), and the Southern Resident killer whale ("SRKW") DPS. Accordingly, the 2024 BiOp purportedly identifies a Reasonable and Prudent Alternative ("RPA") to avoid jeopardy to those species. However, the 2024 BiOp contains multiple significant and unprecedented flaws that not only render these jeopardy conclusions unfounded, but also present potential far-reaching and negative consequences for future projects within the Yuba River Watershed and along the entire West Coast of the United States.

4.      For example, FERC is currently engaged in ESA consultations with NMFS regarding YCWA's relicensing applications for Yuba River Development Project (the "YRDP") and the Narrows

---

[1] Defendants NMFS, Secretary Lutnick, and Regional Administrator Quan are collectively referred to as "NMFS," while Defendants USACE, Lieutenant General Graham, and Colonel McTighe are collectively referred to as "USACE" or "the Corps."

Project. While both projects will result in improved conditions for CV spring-run Chinook salmon and CCV steelhead in the Lower Yuba River, the 2024 BiOp creates precedent for the irrational conclusion that any take associated with CV spring-run Chinook salmon or CCV steelhead—even for projects that will improve conditions—would result in jeopardy to these listed species and, in turn, SRKW.

5. Moreover, after the 2024 BiOp was issued, YCWA, NMFS, and the California Department of Fish and Wildlife ("CDFW") executed the Yuba River Resilience Initiative Agreement ("YRRI") on April 25, 2025, which will enhance and restore native fish habitat in the Yuba River Watershed while also safeguarding water for Yuba County farmers. Under the terms of the 2024 BiOp, implementing the YRRI will require reconsultation; however, the 2024 BiOp could unwind this agreement, which is contingent on the YRDP and Narrows Project relicensings.

6. In response to NMFS's issuance of the 2024 BiOp, USACE notified NMFS on December 19, 2024, that USACE disagreed with the jeopardy conclusions and questioned whether the 2024 BiOp was supported by the available scientific evidence. USACE also emphasized that it could not take any actions that were beyond the scope of its abilities or statutory authorities; however, USACE stated that it "intends to implement the RPA where it has authority to do so."

7. As set forth below, NMFS failed to comply with the ESA and the APA when it prepared and issued the 2024 BiOp and NMFS's analysis and conclusions in the 2024 BiOp are arbitrary and capricious. Accordingly, YCWA seeks declaratory relief and an injunction remanding the erroneous portions of the 2024 BiOp to NMFS without vacatur, requiring NMFS reconsult with the Corps, prepare a new biological opinion that complies with the ESA and all other applicable laws, and not rely on the erroneous portions of the 2024 BiOp as precedent in any future ESA consultations.

8. Moreover, the Corps failed to comply with the ESA and the APA by agreeing to implement the RPA identified in the 2024 BiOp, despite the fundamental legal and factual errors in the 2024 BiOp and its lack of authority to implement several of its provisions. Accordingly, YCWA seeks declaratory relief and an injunction enjoining the Corps from implementing the RPA set forth in the inadequate 2024 BiOp, requiring the Corps to reinitiate consultation with NMFS for a new biological opinion that complies with the ESA and all other applicable laws, and not rely on the erroneous portions of the 2024 BiOp as precedent in any future ESA consultations.

9.      Absent such relief, continued reliance on the 2024 BiOp will result in irreparable damage to YCWA's economic and environmental interests on the Yuba River.

## JURISDICTION AND VENUE

10.     The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims alleged in this Complaint arise under the laws of the United States, including the ESA and the APA. The court is authorized to issue declaratory relief pursuant to 28 U.S.C. § 2201, and injunctive relief pursuant to 28 U.S.C. § 2202 and rule 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(e)(1), and this action is properly filed in the Sacramento Division of the Eastern District, because the acts and omissions giving rise to the claims alleged in this complaint occurred, and will continue to occur, within the boundaries of the Sacramento Division of the Eastern District and the effects of Defendants' actions will be felt by YCWA and its Member Units in this division of the Eastern District. Also, YCWA's headquarters is located within this division of the Eastern District.

## PARTIES

12.     YCWA is a public agency that was established in 1959 by the Yuba County Water Agency Act. See Yuba County Water Agency Act of 1959 ("YCWA Act"), Cal. Water Code § Ch. 84. YCWA is headquartered in Marysville, California, and is governed by a seven-member Board of Directors. YCWA was created "for the purpose of accomplishing a function of statewide importance." YCWA Act, Cal. Water Code § 84-1. YCWA has the powers to: (a) "control the flood and storm waters of the agency and the flood and storm waters of streams that have their sources outside of the agency, which streams and floodwaters flow into the agency, and to conserve such waters for the beneficial and useful purposes of said agency;" (b) "do any and every lawful act necessary in order that sufficient water may be available for any present or future beneficial use;" and (c) "develop hydroelectric power to the extent that such power can be developed in connection with the construction and operation of its projects." *Id*. §§ 84-4, 4.1 & 4.2.

13.     Defendant NMFS is an office of the National Oceanic and Atmospheric Administration within the U.S. Department of Commerce ("DOC"). Among other things, NMFS is the federal agency responsible for administering the ESA for marine and anadromous species.

14. Defendant DOC is a department of the United States government that is responsible for administering federal programs under the ESA

15. Defendant Howard Lutnick is Secretary of Commerce ("Secretary") and is named herein in his official capacity. The Secretary has delegated to NMFS the responsibility of issuing written opinions setting forth the Secretary's conclusions about the effects of proposed agency actions on ESA-listed species and critical habitat.

16. Defendant Jennifer Quan is Regional Administrator of the West Coast Region of NMFS and is named herein in her official capacity.

17. Defendant USACE is a division of the U.S. Department of the Army Defense and is responsible for providing engineering services in the U.S. and worldwide. Among other things, USACE is responsible for administration of Daguerre Point Dam.

18. Defendant Lieutenant General William H. "Butch" Graham, Jr. is Commanding General of the Corps and is named herein in his official capacity.

19. Defendant Colonel Robert M. McTighe, is District Commander of the Sacramento District of the Corps and is named herein in his official capacity.

## GENERAL ALLEGATIONS

### A. FACTUAL BACKGROUND

#### a. Geographic Context, Purpose, and History of Daguerre Point Dam

20. The Yuba River watershed encompasses 1,339 square miles on the western slopes of the Sierra Nevada in Sierra, Placer, Yuba, and Nevada Counties. The primary watercourses of the upper Yuba River watershed are the South, Middle, and North Yuba Rivers, which flow into Englebright Reservoir. The upper Yuba River watershed has numerous dams and related facilities that divert and store water for power generation and deliveries to water users. The lower Yuba River consists of the approximately 24-mile stretch of the river from Englebright Dam downstream to the Yuba River's confluence with the Feather River near Marysville. Daguerre Point Dam is located about 9 miles northeast of Marysville and 11.5 river miles upstream of the confluence of the Yuba and Feather Rivers.

21.     The Yuba River watershed has undergone substantial changes since 1849. Gold mining practices during the 19th century, particularly hydraulic mining, significantly altered both the geography of the watershed and Yuba River channels. Hydraulic mining involved washing away entire hillsides with high-pressure hoses. This practice resulted in hundreds of thousands of cubic yards of mining debris flowing into the lower Yuba River. The mining debris covered hundreds of acres of land, raised riverbeds by tens of feet in places, and resulted in substantial changes to river channels. The mining debris eventually settled in places ranging from the original riverbed channels to San Francisco Bay, creating enormous difficulties for river navigation.

22.     The California Debris Commission was created by the Act of March 1, 1893, ch. 183, § 1, 27 Stat. 507. This commission was composed of officers of the Corps and exercised its powers under the supervision of the Chief of Engineers and the direction of the Secretary of War. *Id*. To address the problems associated with hydraulic mining debris from the Yuba River, Congress authorized the California Debris Commission to construct Daguerre Point Dam pursuant to the Rivers and Harbors Appropriation Act of 1902, ch. 1079, 32 Stat. 331, 369, and Englebright Dam pursuant to the Rivers and Harbors Improvement Act of 1935. Daguerre Point Dam was completed in 1906, and Englebright Dam was completed in 1941. Although hydraulic mining on the Yuba River ended long ago, both dams continue to provide substantial environmental benefits by retaining toxic mining debris and promoting restoration of lower Yuba River channels.

23.     The California Debris Commission was abolished in 1986, and administration of Englebright Dam and Daguerre Point Dam was transferred to the Corps. Water Resources Development Act of 1986, Pub. L. No. 99-662, § 1106, 100 Stat. 4082, 4229. The Corps' discretionary activities at Daguerre Point Dam are limited by Congressional authorizations and the dam's structure (i.e., the dam is a debris-barrier, overflow dam and does not control flows on the Yuba River). The Corps maintains the existing fish ladders at Daguerre Point Dam.

### b. *YCWA's Facilities, Operations, and Activities in the Yuba River Watershed Affected by the 2024 BiOp*

#### i. *YCWA's Facilities and Operations*

24.     YCWA owns and operates the Yuba River Development Project (the "YRDP") and the Narrows Project. The principal components of the YRDP are New Bullards Bar Reservoir, the New

Colgate Powerhouse and the Narrows 2 Powerhouse. The Narrows Project includes the Narrows 1 Powerhouse, which operates in coordination with the YRDP's Narrows 2 Powerhouse. In addition to critical flood control to Marysville and other downstream communities, New Bullards Bar Reservoir provides water supplies for YCWA's Member Units (the eight water districts and water companies identified below that deliver irrigation water supplies in YCWA's water service area), YCWA's water transfers outside of Yuba County, and renewable hydroelectric power generation at the New Colgate, Narrows 1, and Narrows 2 Powerhouses. New Colgate Powerhouse, YCWA's largest power generation facility, is a major provider of electric energy and capacity for Northern California and plays a central role in stabilizing the Northern California power grid by providing a wide range of ancillary services. Any restrictions on YCWA's operation of New Colgate Powerhouse to provide peaking power and ancillary power services would reduce the value of the New Colgate Powerhouse and have direct impacts on YCWA's interests and energy consumers throughout the Northern California region.

25.    YCWA, in cooperation with its Member Units, stakeholders, and local, state, and federal agencies, has a long history of actively managing and regulating Yuba County's water resources for beneficial uses. The following eight districts are YCWA Member Units: Brophy Water District, Browns Valley Irrigation District, Cordua Irrigation District, Dry Creek Mutual Water Company, Hallwood Irrigation Company, Ramirez Water District, South Yuba Water District, and Wheatland Water District. YCWA delivers approximately 300,000 acre-feet per year of irrigation water supplies to these Member Units.

26.    YCWA owns, operates and maintains the Yuba South Canal and related diversion facility ("South Canal Diversion") and related facilities, which divert water from the Yuba River at Daguerre Point Dam and convey the water to YCWA's South Member Units.

*ii.  Lower Yuba River Accord*

27.    YCWA also is a leader in statewide water transfers and lower Yuba River fisheries restoration and enhancement activities, and is involved in many constructive efforts with local, state, and federal agencies, and conservation groups to benefit Yuba River fisheries.

28.    In 2005, YCWA and 16 other interested parties signed memoranda of understanding ("MOUs") that specified the terms of the Lower Yuba River Accord ("Yuba Accord"), a

7

comprehensive, consensus-based program to protect and enhance aquatic habitat in the lower Yuba River downstream of Englebright Dam. Besides YCWA, the parties signing these MOUs included NMFS, U.S. Fish & Wildlife Service ("USFWS"), CDFW (formerly California Department of Fish and Game), the California Department of Water Resources ("DWR"), Trout Unlimited ("TU"), the Bay Institute ("TBI"), the South Yuba River Citizens League ("SYRCL"), Friends of the River ("FOR"), Pacific Gas & Electric Company ("PG&E"), and seven of YCWA's Member Units.

29.     The Yuba Accord was the result of a multiple-year collaborative process involving all these parties. The Yuba Accord instream flow requirements were developed by biologists from CDFW, NMFS, USFWS, YCWA and a representative of the environmental organizations. The Yuba Accord was designed to benefit aquatic resources in the lower Yuba River, particularly CCV steelhead and CV spring-run and fall-run Chinook salmon, by providing instream flows and water temperatures in the lower Yuba River that will provide the maximum benefits possible for these species of fish within the constraints of available water supplies, applicable regulatory and contractual requirements, and other demands for water.

30.     The Yuba Accord consists of: (a) the Yuba Accord Fisheries Agreement, which specifies the Yuba Accord's lower Yuba River minimum instream flows and creates a detailed fisheries monitoring and evaluation program; (b) the Water Purchase Agreement, under which DWR purchases a minimum of 60,000 acre-feet per year of water for fish and wildlife purposes in the Bay-Delta ecosystem and water for State Water Project and Central Valley Project contractors; (c) the Conjunctive Use Agreements with seven of YCWA's Member Units, which specify the terms of the Yuba Accord's groundwater conjunctive-use program; and (d) amendments to the 1966 Power Purchase Contract between YCWA and PG&E. The Water Purchase Agreement was the first, major long-term acquisition of water by the state for the Bay-Delta under the state's Environmental Water Account. YCWA, CDFW, SYRCL, FOR, TU and TBI are all parties to the Yuba Accord Fisheries Agreement.

31.     Although the NMFS and USFWS are not signatories to the final Yuba Accord agreements (because of federal law constraints), they officially supported the Yuba Accord in the California State Water Resources Control Board ("SWRCB") process on the Yuba Accord. On May 20, 2008, the SWRCB adopted its Corrected Order WR 2008-0014, which added the instream flow

requirements in the Yuba Accord Fisheries Agreement as regulatory requirements in YCWA's water-right permits. The SWRCB's adoption of this order ended almost 20 years of disputes and litigation over lower Yuba River instream flows.

32.     YCWA has been operating the YRDP in conformance with the Yuba Accord since 2006. The 2006, 2007, and early 2008 YRDP operations were under one-year pilot programs that were approved by the SWRCB. Since May 20, 2008, when the SWRCB adopted its Corrected Order WR 2008-0014, YCWA has operated the YRDP under the terms of the Yuba Accord.

33.     Besides specifying a comprehensive set of minimum instream flows for the lower Yuba River, the Yuba Accord Fisheries Agreement also created the Yuba Accord River Management Team (the "River Management Team"). The River Management Team comprises representatives of YCWA, NMFS, USFWS, CDFW, DWR, SYRCL, TBI, FOR, TU, USACE, and the Pacific States Marine Fisheries Commission. The River Management Team evaluates flows and implements fisheries studies and has developed robust active research and a state-of-the-art monitoring and evaluation program for the lower Yuba River. The River Management Team studies upstream migration, spawning, juvenile rearing, and out-migration life stages of Chinook salmon and steelhead and identifies potential habitat restoration and enhancement measures in the river.

34.     YCWA is currently petitioning the SWRCB to extend its prior approval of the existing places of use, purposes of use, and points of rediversion for the Yuba Accord's long-term Water Transfer Program beyond its prior termination date of December 31, 2025, through 2050. The Yuba Accord's Fisheries Agreement, however, does not expire in 2025 and will remain in effect until YCWA obtains a new long-term hydropower license for the YRDP from the Federal Energy Regulatory Commission.

### iii.   Yuba River Resilience Initiative Agreement

35.     For several years, YCWA has collaborated with NMFS and CDFW to develop the YRRI to enhance and restore habitat in the Yuba River watershed for native fish, while safeguarding water for Yuba County farmers.

36.     The YRRI consists of two major components:

YUBA COUNTY WATER AGENCY'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

a. The Nature-like Fishway ("NLF") in the lower Yuba River at Daguerre Point, for volitional passage for the target listed species of spring-run Chinook salmon, steelhead, and green sturgeon, and the other target anadromous fish species of Pacific lamprey, fall-run Chinook salmon, and white sturgeon. The NLF includes relocating the South Canal Diversion and modernizing the fish screening facility to meet NMFS and CDFW screening criteria. YCWA's construction of the NLF will provide an effective, long-term passage solution on the lower Yuba River at Daguerre Point by providing a channel around Daguerre Point Dam. The NLF will restore unimpeded volitional passage and access for fish to the entire lower Yuba River from its confluence with the Feather River up to Englebright Dam for the first time in nearly a century.

b. The Reintroduction Program for reintroducing spring-run Chinook salmon into the North Yuba River upstream of New Bullards Bar Reservoir.

37. In February 2025, YCWA's Board of Directors approved an environmental analysis for the NLF and YRRI. That environmental analysis did not cover the Reintroduction Program, as CDFW will be leading the effort to implement the Reintroduction Program.

38. The YRRI Agreement was executed by NFMS, CDFW and YCWA on April 25, 2025.

39. YCWA is in the process of applying to USACE for a 404 permit associated with the NLF, including relocating the South Canal Diversion and modernizing the fish screening facility. USACE's processing of this application is affected by the 2024 BiOp, which requires reconsultation before a new fish screen is constructed at the South Canal Diversion.

### c. ESA Consultations and Litigation History

40. As explained above, Daguerre Point Dam and Englebright Dam were constructed and became operational long before Congress enacted the ESA, for the primary purpose of trapping hydraulic mining debris from upstream areas. The Corps has operated both dams since the California Debris Commission was abolished in 1986.

41. Following the ESA listings of CV spring-run Chinook salmon and CCV steelhead as threatened species, USACE initiated consultation on both dams in 2000 at NMFS's request. NMFS issued a five-year interim biological opinion that analyzed the effects of USACE's operations and

maintenance of Englebright Dam and Daguerre Point Dam on the listed species on March 27, 2002 (the "2002 BiOp"). The 2002 BiOp concluded that USACE's operations and maintenance of these dams were not likely to jeopardize the continued existence of the listed species or destroy or adversely modify designated critical habitat for these species over the five-year period.

42.     On April 27, 2007, NMFS issued an interim BiOp that analyzed the effects of continuation of USACE's operations and maintenance of these dams for a period of one year (the "April 2007 BiOp"). The April 2007 BiOp concluded that USACE's operations and maintenance were not likely to jeopardize the continued existence of the listed species or destroy or adversely modify designated critical habitat for these species over the one-year period.

43.     On November 21, 2007, NMFS issued a long-term BiOp that analyzed the effects of USACE's operations and maintenance of Englebright Dam and Daguerre Point Dam on CV spring-run Chinook salmon, CCV steelhead, the respective designated critical habitats for these salmonid species, and the threatened Southern DPS of North American green sturgeon (the "November 2007 BiOp"). The November 2007 BiOp concluded that USACE's future operations and maintenance of Englebright and Daguerre Point Dams would not jeopardize species listed under the ESA.

44.     SYRCL and FOR filed a lawsuit challenging the 2002 and 2007 BiOps.  On July 8, 2010, the U.S. District Court for the Eastern District of California issued an order concluding that NMFS's conclusions in the November 2007 BiOp and issuance of the associated incidental take statement were arbitrary and capricious. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F.Supp.2d 1247 (E.D. Cal. 2010). On April 29, 2011, the court directed NMFS to prepare a new biological opinion, consistent with that order.

45.     After the court found the November 2007 BiOp inadequate, USACE voluntarily reinitiated consultation with NMFS to prepare a new BiOp. On February 27, 2012, NMFS circulated a draft of the 300-page 2012 BiOp to USACE and YCWA and requested comments on the draft by the following day. Despite the short review period, YCWA and USACE identified extensive factual and legal errors in the draft. NMFS issued the final 2012 BiOp on February 29, 2012, largely ignoring USACE's and YCWA's comments. The 2012 BiOp concluded that USACE's activities at Englebright Dam and Daguerre Point Dam would result in jeopardy to listed species.

46.    In January 2013, YCWA filed a lawsuit challenging the 2012 BiOp, as did SYRCL and FOR. On February 26, 2013, USACE reinitiated consultation and filed a motion to stay both lawsuits. In light of the reinitiated consultation, on August 8, 2013, the court stayed the litigation challenging the 2012 BiOp, ordered USACE to prepare a new biological assessment by October 22, 2013, ordered NMFS to issue a new biological opinion by May 12, 2014, and directed NMFS to not rely on the 2012 BiOp. *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. 2:13-CV-00042-MCE, 2013 WL 4094777 (E.D. Cal. Aug. 13, 2013).

47.    USACE then prepared two new biological assessments, one for Daguerre Point Dam and one for Englebright Dam. NMFS issued a new biological opinion in May 2014 ("2014 BiOp") for USACE's actions at Daguerre Point Dam, which concluded that USACE's actions would not result in jeopardy to listed species. Additionally, NMFS issued a letter of concurrence ("LOC") on USACE's biological assessment for Englebright Dam, which concluded that USACE's actions could affect, but would be unlikely to adversely affect, listed species or their designated critical habitats.

48.    In 2016, FOR filed a lawsuit challenging the 2014 BiOp, USACE's biological assessment for Englebright Dam, and NMFS's associated LOC. YCWA is an intervenor-defendant in the litigation.  On October 3, 2019, the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") held that the 2014 BiOp and LOC failed to include a "reasoned explanation" for excluding from the scope of the proposed action: (1) the continued existence of Daguerre Point Dam and Englebright Dam on the Yuba River, and (2) third party operations of hydroelectric facilities abutting Englebright Dam and water diversions adjacent to Daguerre Point Dam. *Friends of the River v. National Marine Fisheries Service*, 786 Fed. Appx. 666 (9th Cir. 2019). The court held that, absent that explanation, the court could not determine whether the updated approach was proper.  The court remanded the matter "with instructions for the district court to remand the 2014 opinions to the Service for further explanation." See *id.* at 668.  Thus, in November 2020, the district court ordered NMFS to either explain its conclusions in the 2014 BiOp and LOC regarding the scope of the Corps' actions or issue a new biological opinion consistent with the Ninth's Circuit mandate.

49.    On February 28, 2022, NMFS issued the further explanation mandated by the Ninth Circuit for the LOC, endorsing USACE's reasoning in the Englebright Dam biological assessment.

Also, around that time, USACE and NMFS reinitiated consultation on Daguerre Point Dam. USACE released a new biological assessment for Daguerre Point Dam in April 2023 ("2023 BA"), and NMFS issued the 2024 BiOp for Daguerre Point Dam on July 30, 2024. The 2024 BiOp concludes that USACE's Proposed Action is likely to jeopardize the continued existence of CV spring-run Chinook salmon, CCV steelhead, and SRKW and adversely modify their designated critical habitats. Accordingly, the 2024 BiOp identifies the RPA to avoid jeopardy.

50.     On December 19, 2024, USACE notified NMFS that it "disagrees that its limited operation and maintenance activities at the [Daguerre Point Dam] fish ladders will lead to jeopardy or adverse modification of designated critical habitat and questions whether NMFS' conclusions are supported by the available scientific information." The notice further states that USACE is concerned that the 2024 BiOp attributes a broader scope of effects to the Proposed Action than USACE's 2023 BA. Specifically, USACE explained that the 2024 BiOp appears to find that USACE has broader authority and discretion than articulated in the 2023 BA and, thus, to expand the scope of the scope of the action, contrary to the guidance in the Memorandum between the Department of the Army (Civil Works) and the National Oceanic and Atmospheric Administration (of which NMFS is a division) dated January 5, 2022 ("Memorandum"). See also 89 Fed. Reg. 24,276 (Apr. 5, 2024) ("While the Services ultimately determine the content and scope of the analyses in our biological opinions, generally we would defer to the Federal action agency's supported interpretation of their authorities for purposes of identifying what non-discretionary Federal facilities and activities are included in the 'environmental baseline."). USACE's notice, however, states that notwithstanding these concerns, USACE intends to implement the RPA where it has authority to do so, but that it "cannot take action that is inconsistent with project authorizations or other constraints on USACE statutory authorities."

51.     On March 24, 2025, YCWA sent a letter to NMFS and the Corps outlining a number of significant legal and factual errors in the 2024 BiOp that not only result in an unfounded jeopardy conclusion for the Corps' ongoing operation and maintenance activities at Daguerre Point Dam but also present potential far-reaching a negative consequences for future projects within the Yuba River Watershed and along the entire West Coast of the United States.

/ / /

**B.  VIOLATIONS OF THE APA AND ESA BY NMFS AND THE CORPS**

52.     NMFS's 2024 BiOp is inconsistent with the requirements of both the APA and the ESA. Specifically, and as explained more fully below, the 2024 BiOp is inadequate because: (a) the jeopardy conclusions for listed fish species are arbitrary and capricious; (b) the jeopardy conclusion for SRKW is arbitrary and capricious; (c) the cumulative effects analysis is substantially flawed and does not support the jeopardy conclusions; (d) it does not address the errors previously identified in the ESA litigation; (e) it inappropriately redefined the Proposed Action and USACE's discretionary authorities; and (f) USACE cannot fully implement the RPA. Thus, USACE's decision to accept the RPA was arbitrary and capricious, and USACE must reinitiate consultation.

53.     Moreover, NMFS's failure to prepare and issue an adequate biological opinion, as described in this notice, rendered USACE's conditional acceptance of the RPA a violation of the ESA as well. Although preparation and issuance of a lawful biological opinion was NMFS's duty, USACE also has a duty under ESA section 7(a)(2) to "use the best scientific and commercial data available." Although USACE's 2023 BA satisfies this requirement, USACE nevertheless violated the ESA when it agreed to implement the RPA despite its concerns that it lacked authority and its reservations about the adequacy of the supporting evidence for the 2024 BiOp.

54.     As noted above, the 2024 BiOp has numerous flaws and errors that each warrant review and separately constituted an abuse of discretion. YCWA describes these problems in the following paragraphs.

### a.  The 2024 BiOp's jeopardy conclusions for listed fish species are arbitrary and capricious

55.     The 2024 BiOp's conclusions that the Proposed Action in the lower Yuba River will jeopardize the continued existence of CV spring-run Chinook salmon and CCV steelhead are not supported by evidence in the record. Many of the 2024 BiOp's broad, overstated impact conclusions are based on nothing more than unsubstantiated conjecture and are inconsistent with both the 2023 BA and previous NMFS biological opinions.

56.     As an initial matter, the 2024 BiOp does not include any quantitative take estimate for CV spring-run Chinook salmon or CCV steelhead expected to result from the Proposed Action. This is a departure from NMFS's 2014 BiOp, which evaluated activities that are largely equivalent to the

Proposed Action, and which provided lifestage-specific take estimates for both species and reached a no-jeopardy conclusion. As the 2024 BiOp does not provide updated take estimates or otherwise suggest that the 2014 BiOp's take estimates are inaccurate, the 2014 BiOp is the only available take estimate for the Proposed Action. It is not clear why NMFS changed its analytical approach from the 2014 BiOp to reach jeopardy conclusions for CV spring-run salmon and CCV steelhead in the 2024 BiOp. The 2024 BiOp does not contain sufficient evidence or analysis to demonstrate that the quantity of take estimated to occur as a result of the Proposed Action would jeopardize the continued existence of CV spring-run Chinook salmon and CCV steelhead.

57.    Additionally, as the 2024 BiOp explains, a jeopardy determination must consider whether an action will reduce the viability of populations within a listed species, and if so, whether the reduced population viability will in turn reduce the viability of the species. Yet the 2024 BiOp does not meaningfully evaluate the viability of individual populations that comprise CV spring-run Chinook salmon or CCV steelhead, or how the Proposed Action will affect population viability and in turn, viability of the species. Instead, without any detailed analysis, NMFS simply determined that the incremental effect of the Proposed Action would extend far beyond the lower Yuba River and ultimately jeopardize the continued existence of CV spring-run Chinook salmon and CCV steelhead across the species' entire ranges. With respect to CV spring-run Chinook salmon, the 2024 BiOp states:

> Recognizing that the CV spring-run Chinook salmon ESU is currently at a moderate to high risk of extinction (SWFSC 2022), any reduction in the viability of the Yuba River population is likely to reduce the viability and further increase the extinction risk of the ESU. Therefore, the proposed action is expected to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of CV spring-run Chinook salmon.

58.    The 2024 BiOp makes the same claim for CCV steelhead.

59.    Under NMFS's reasoning in the 2024 BiOp that any reduction in the viability of the Yuba River populations of CV spring-run Chinook salmon or CCV steelhead (by reducing the reproduction, numbers, or distribution) causes jeopardy to the species and adversely modifies the species' critical habitat, any water project on the Yuba River—or within the Central Valley—that is not entirely beneficial would also result in an unfounded jeopardy analysis and conclusion.

60.    Additionally, the 2024 BiOp's statement that "the CCV steelhead DPS is currently at a

15

moderate to high risk of extinction" is not supported by the record. NMFS's most recent 5-year status review, which was issued during December 2024, occurred later in time than when the 2024 BiOp was issued (July 2024). Moreover, the NMFS 2024 status review does not specifically state that the CCV steelhead DPS is at "moderate or high extinction risk." The NMFS 2024 status review, and presumably the 2024 BiOp, relies upon another NMFS document by Johnson et al. (2023), which states: "Based upon the limited information available, we find that the overall viability of the CV Steelhead DPS unchanged since the 2015 assessment. Therefore, the biological extinction risk is considered "Stable" and in the species remains in "Moderate" risk category."

61. Rather than provide accurate and realistic details about the scope, magnitude, or frequency of potential impacts associated with the USACE Proposed Action, the 2024 BiOp instead generally assumes, without supporting evidence or analysis, that the Proposed Action would have overstated and unprecedented impacts that greatly exceed the scope of the Proposed Action or any other similar activities analyzed by NMFS in other biological opinions.

62. For example, regarding fish ladder operations and maintenance, the 2024 BiOp states:

The proposed action includes long (*i.e.*, several days or more) potential gate closures expected on average every two years due to high flow occurrences, and extended closures due to gate failures expected on average every two years due to high flow occurrences, and extended closures due to gate failures occurring twice in the last ten years with no alternative passage solutions. Given the three-year life cycles of returning spawning CV spring-run Chinook and CV steelhead, closures at a frequency where multiple cohorts are impacted, or that single, extended closures (over one week), risk the viability of the Yuba population.

63. This conclusion that the Proposed Action could reduce population viability is unfounded for many reasons, including the following:

a. The 2024 BiOp does not evaluate the specific mortality that occurs from gate closures, explain the relative significance of mortalities that occur during repeated or extended closures to population viability, or provide any technical basis to support the use of one week as a threshold for identifying threats to population viability.

b. The conclusion is based on a highly speculative worst-case scenario in which "no alternative passage solutions" exist, which is unlikely given that there are two fish ladders (North and South ladders) at Daguerre Point Dam.

c.  The conclusion improperly attributes to the Proposed Action potential effects caused by physical limitations of the existing fish ladders under the environmental baseline (i.e., limited ability to accommodate high flows) or acts of God (e.g., gate failures due to stormflow debris).

64.  The flaws in the 2024 BiOp's analysis of CV spring-run Chinook salmon and CCV steelhead are numerous and significant. While YCWA has identified several examples of the 2024 BiOp's errors above, those examples are merely intended to illustrate the types of errors that appear throughout the 2024 BiOp. These flaws in the 2024 BiOp render the jeopardy conclusion for CV spring-run Chinook salmon and CCV steelhead arbitrary and capricious.

**b.  The 2024 BiOp's jeopardy conclusion for SRKW is arbitrary and capricious**

65.  The 2024 BiOp concluded that the Proposed Action is likely to jeopardize the continued existence of SRKW and destroy and modify its designated critical habitat. This conclusion is not adequately supported by evidence in the record. Moreover, the unfounded and speculative conclusion reflects a significant departure from the 2023 BA, as well as NMFS's approach to previous biological opinions for projects along the West Coast of the United States.

66.  The 2024 BiOp's jeopardy conclusion for SRKW is based on its determination that the Proposed Action would impact (i.e., jeopardize the continued existence of) CV spring-run Chinook salmon, an important prey source for SRKW. As explained above, the 2024 BiOp's jeopardy conclusion for CV spring-run Chinook salmon is unfounded. As a result, the SRKW jeopardy conclusion is similarly baseless.

67.  Regardless, although Chinook salmon throughout the entire Central Valley of California make up a portion of the SRKW prey base, there is absolutely no evidence to suggest any type of linkage between USACE's Proposed Action at Daguerre Point Dam in the lower Yuba River and biological effects on SRKW in the Pacific Ocean that could result in direct mortality to SRKW individuals, let alone to population-level effects that would jeopardize the continued existence of the species.

68.  The 2023 BA did not evaluate impacts on SRKW, based on not only its finding that the Proposed Action would not have adverse population-level effects on adult spring-run Chinook salmon,

but also prior analyses of impacts to SRKW in NMFS biological opinions for projects with potential

impacts to Chinook salmon. Prior to issuing the 2024 BiOp, NMFS issued a number of biological

opinions that either omitted an analysis of SRKW altogether or determined there would be no adverse

effects to SRKW, including:

  a. A 2020 biological opinion for ongoing operations and maintenance of fourteen federal
     dams along the Columbia River System, involving five distinct species of Chinook
     salmon, which determined the activities would not adversely affect SRKW.

  b. A 2019 biological opinion for long-term operation of the Central Valley Project and
     State Water Project in the Central Valley of California, involving winter-, spring-, fall-,
     and late-fall-run Chinook salmon, which determined the activities would not jeopardize
     SRKW.

  c. A 2024 biological opinion for long-term operation of the Central Valley Project and
     State Water Project in the Central Valley of California, which was the result of
     reinitiation of consultation, which determined that the proposed action would not
     jeopardize SRKW and would not result in destruction or adverse notification of their
     designated critical habitat.

  d. A 2024 biological opinion for the Merced River Agricultural Diversion and Fish Habitat
     Enhancement, which identified adverse effects to Chinook salmon but did not address
     SRKW.

  e. A 2023 biological opinion for the South Delta Temporary Barriers Project, which
     identified adverse effects to Chinook salmon but did not address SRKW.

69.    Consistent with these analyses, and given the complete lack of evidence to suggest that

the Proposed Action could have potential adverse effects to SRKW, USACE reasonably did not address

SRKW in the 2023 BA.

70.    In fact, the 2024 BiOp acknowledges the absence of data tying the Proposed Action to

SRKW impacts. It concedes that "There is no data available to help NMFS quantify impacts to foraging

behavior or any changes to health of individual killer whales in the population from a specific amount

of removal of potential prey resulting from the proposed action." Absent any evidence allowing NMFS

to discern the potential contribution of the lower Yuba River CV spring-run Chinook salmon

population to the SRKW prey base in the Pacific Ocean, let alone to potential changes in feeding

behavior of individual SRKWs or the population overall, there is plainly no basis for NMFS's

conclusion that the Proposed Action would jeopardize the continued existence of SRKW.

71.     Nevertheless, the 2024 BiOp assumes that the unquantified (and unproven) reductions in

CV spring-run Chinook salmon from the Proposed Action would necessarily affect SRKW. In doing so,

the 2024 BiOp relies on misleading characterizations of the SRKW diet. For example, the 2024 BiOp

states:

> CV Chinook salmon constitute a sizable proportion of the total abundance of Chinook
> salmon in SRKW diet in the winter and spring months. CV Chinook salmon become an
> increasingly significant portion of prey source during any southerly movements of SRKW
> along the coast of Oregon and California that may occur during the winter and spring
> (Hanson *et al.* 2021; NMFS 2021c). CV fall-run Chinook salmon can be expected to
> constitute at least 25 percent of local abundance in many places throughout this area at any
> time (Bellinger *et al.* 2015), and are expected to constitute well over 50 percent of the local
> abundance of Chinook salmon in some areas off California when SRKW are present there
> (Shelton *et al.* 2019). Hanson *et al.* (2021) used genetic analysis of prey remains and fecal
> samples to determine the composition of SRKW prey in their coastal habitat in the fall,
> winter, and spring months between 2004 and 2017. They found that although the average
> proportion of the diet made up by CV Chinook salmon from February through April is
> about 20 percent, the contribution varies in each of those months.

> The dominant CV stock noted in the study from 2004 to 2017 in February and March was
> observed to be spring-run Chinook salmon with $18.3 \pm 11$ percent of the February diet and
> $11.7 \pm 9$ percent of the March diet. In April, $26.6 \pm 17.1$ percent of SRKW diet is composed
> of CV fall-run Chinook salmon, with no spring-run Chinook salmon detected in that month
> (Hanson *et al.* 2021).

72.     This characterization is missing important context and is potentially misleading, for the

following reasons:

a. This section of the 2024 BiOp is missing the helpful context that Chinook salmon is one
   of only 22 fish species that are prey for SRKW.

b. That CV fall-run Chinook salmon may comprise more than 25 or 50 percent of Chinook
   salmon in certain coastal areas where SRKW are present does not mean that they are
   preyed upon by SRKW in the same proportions. Moreover, these estimates pertain to
   fall-run Chinook salmon (which are much more abundant than spring-run Chinook

salmon), not to spring-run Chinook salmon, and certainly not to spring-run Chinook salmon from the lower Yuba River.

 c. The cited Hanson *et al*. (2021) study found that during Mid-Winter/Early Spring roughly 19% of SRKW prey consisted of all CV Chinook salmon, but a smaller portion - 11% - consisted of CV spring-run Chinook salmon. Again, these estimates are for the entirety of CV spring-run Chinook salmon, not Yuba River spring-run specifically. Moreover, no study has determined the proportion of CV spring-run Chinook salmon SRKW prey that comes from each of the numerous rivers and streams that encompass the CV spring-run Chinook salmon ESU, from hatcheries, or from the lower Yuba River.

 d. Although the 2024 BiOp states that "The dominant CV stock noted in the study from 2004 to 2017 in February and March was observed to be spring-run Chinook salmon with $18.3 \pm 11$ percent of the February diet and $11.7 \pm 9$ percent of the March diet", the 2024 BiOp does not disclose the limitations associated with the very limited data set. In fact, the February estimate of 18.3% of the SRKW diet reported in the 2024 BiOp appears to result from data collected during February of only 1 year out of the 14 years in the data set.

 73. Moreover, the 2024 BiOp excludes Feather River Fish Hatchery ("FRFH") fish from the CV spring-run Chinook salmon ESU. The basis for this decision is unclear, as are its implications for NMFS's conclusions about the effects on the Yuba River population, the viability of the Northern Sierra Diversity Group, and the continued existence of the entire ESU.  As hatchery influence is the basis for the "moderate to high extinction risk" determination for the Yuba River population, if spring-run Chinook salmon from the FRFH are included in the CV spring-run Chinook salmon ESU, and in the extinction risk considerations and effects analysis, that could change the perceived magnitude of effect on the Yuba River population from operations and maintenance ("O&M") of Daguerre Point Dam.  In turn, inclusion of FRFH spring-run Chinook salmon would likely change the jeopardy and adverse modification determination in the 2024 BiOp for SRKW based on the string of conclusions that the magnitude of effect is sufficient to jeopardize the existence of the Yuba River population, which would therefore be sufficient to render the Northern Sierra Diversity Group non-viable (the viability of

which is dependent on 4 viable populations, not just the Yuba River population) which in turn would jeopardize the continued existence of the entire CV spring-run ESU which consists of 4 diversity groups with the ESU viability based on 11 populations.  NMFS failed to consider the best available scientific evidence by failing to address FRFH fish from the CV spring-run Chinook salmon ESU in evaluating jeopardy to the SRKW.

74.     For the above reasons, among others, the 2024 BiOp provides no evidence, data, or analysis to support its conclusion that the USACE Proposed Action of conducting O&M activities at Daguerre Point Dam in the lower Yuba River will "measurably reduce SRKW prey." In fact, the 2024 BiOp did not provide "measurable" estimates of impact to Yuba River spring-run Chinook salmon, to the CV spring-run ESU, to the SRKW oceanic prey base, or to SRKWs themselves.

### c.     The 2024 BiOp's cumulative effects analysis is substantially flawed and does not support the jeopardy conclusions

75.     As the 2024 BiOp points out, cumulative effects are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. The 2024 BiOp's cumulative effects analysis is improperly limited, general, and vague. Because the jeopardy conclusions are based, in part, on the 2024 BiOp's cumulative effects analysis, the flaws in the cumulative analysis further undermine those unsupported conclusions.

76.     The cumulative effects analysis is extremely generalized, open-ended, and vague. As a result, it is impossible to determine whether the 2024 BiOp is addressing cumulative effects for the lower Yuba River populations of spring-run Chinook salmon, steelhead, and green sturgeon, or whether it is addressing effects for the entire ESU/DPS. Moreover, there are no clear distinctions regarding species-specific cumulative effects, as much of the discussion is "lumped" together at a high level. The 2024 BiOp does not provide a clear basis for NMFS to meaningfully discern whether future cumulative effects will impact the functional value of critical habitat and how such cumulative effects would affect the conservation of the species in the Action Area.

77.     Additionally, much of the information in the cumulative analysis is incomplete, irrelevant, or inaccurate. For example:

a. The 2024 BiOp's cumulative effects analysis does not reflect information contained in the 2023 BA, which focused on cumulative effects within the Yuba River Watershed.

b. Some of the information used in the analysis, such as the information about managed wetlands, cattle operations, permafrost degradation, glacier reduction, and riprap projects, is not relevant to the Yuba River Watershed, or even to anadromous fish in California.

c. Some of the information used in the analysis, such as the suggestion that there are 3,356 unscreened diversions in the Yuba River Watershed, is outdated and no longer accurate.

78.     As explained in the 2024 BiOp, NMFS's jeopardy conclusion for the Proposed Action is based, at least in part, on the flawed cumulative effects analysis. In addition to the inadequacies with the jeopardy conclusions described above, the inadequate cumulative effects analysis further demonstrates that the conclusions of jeopardy (and adverse modification of critical habitat) are arbitrary, capricious, not in accordance with the law, and not supported by the "best available" evidence. 5 U.S.C. § 706(2)(A); 16 U.S.C. § 1536(a)(2); *Nw. Env't Advocates v. United States Env't Prot. Agency*, 855 F.Supp.2d 1199, 1226 (D. Or. 2012).

**d.   The 2024 BiOp does not adequately address the errors previously identified in the ESA litigation**

79.     As explained above, the Ninth Circuit previously held that NMFS's 2014 BiOp for Daguerre Point Dam O&M failed to include a "reasoned explanation" for changing its approach from the 2012 BiOp and excluding the continued existence of Daguerre Point Dam and adjacent water diversions by third parties from the analysis. *Friends of the River v. Nat'l Marine Fisheries Serv.*, 786 F.App'x 666, 669–670 (9th Cir. 2019). The court explained that, absent that explanation, the court could not determine whether the updated approach was proper. Notably, the court clarified that USACE was not required to reinitiate consultation to address any purportedly changed circumstances arising after NMFS issued the 2014 BiOp.

80.     Unlike the Englebright LOC that provided the reasoned explanation mandated by the Ninth Circuit regarding NMFS's changed approach, the 2024 BiOp fails to provide any explanation. Because the information is readily available in the record and in the 2023 BA, NMFS should have

responded to the Ninth Circuit's direction by providing the following "reasoned explanations" in the 2024 BiOp:

    a.   An explanation of how USACE's authorizing statutes constrain USACE's discretion to remove or modify Daguerre Point Dam.

    b.   An explanation of why and how NMFS narrowed the scope of the proposed action in the 2014 BiOp, compared to the broader definition of USACE's action analyzed in the 2012 BiOp.

    c.   An explanation of the limitations on USACE's discretion to control or modify third-party water diversion operations.

81.    Even more concerning is the fact that the 2024 BiOp reverts in part to the 2012 BiOp's incorrect interpretation of USACE's authorities relating to the Daguerre Point Dam fish ladders and attributes effects under the environmental baseline to the Proposed Action.

82.    Given the ESA litigation history, NMFS improperly failed to provide a "reasoned explanation" for NMFS's changed approach in the 2014 BiOp. NMFS's failure to adequately justify the extreme changes in its approach to the 2024 BiOp renders the analysis and conclusions in the 2024 BiOp arbitrary, capricious, and inconsistent with the applicable law.

### e. *The 2024 BiOp inappropriately redefined the Proposed Action and USACE's discretionary authorities*

83.    Contrary to the description of USACE's Proposed Action in the 2023 BA, the 2024 BiOp ignores the State of California's roles and responsibilities in the construction, operation, and maintenance of Daguerre Point Dam and its fish ladders and misrepresents USACE's fish passage management role.

84.    USACE has owned Daguerre Point Dam and the underlying land since 1986, when the 1986 Water Resources Development Act transferred all assets, land, and authorities of the California Debris Commission to USACE. The fish ladders located at Daguerre Point Dam, however, were completed by the State of California, Division of Fish and Game in the 1950s, outside of the California Debris Commission and its authorities. In response to the damaging flood flows of 1964, the Daguerre Point Dam fish ladders were reconstructed, and the lower bays were extended at the request of

California Department of Fish and Game (now CDFW) during October of 1965 using federal and state contributed funds. This action was completed as a cost share with the State of California and did not transfer the assets or bring the fish ladders under the California Debris Commission's authority. The 1966 USACE Daguerre Point Dam O&M Manual states "The Construction-Operations Division [of USACE] shall have custody of the operating mechanisms for the fishway gates and shall operate the gates as directed by the Department of Fish and Game…."

85.     Despite this history, NMFS maintains that USACE has the ultimate responsibility for operating and maintaining the dam and fish ladders, as the federal agency that ostensibly owns and operates those structures. NMFS may not simply disregard CDFW's responsibility and unilaterally place all operational responsibility upon USACE—particularly given the 2022 Memorandum, which describes ESA consultations involving existing structures and provides that "NMFS will individually defer to [USACE's] case-specific and supported interpretation of any limits to its discretion on a project-by-project basis."

> ### f.    The Corps cannot fully implement the RPA; thus, its decision to accept the RPA was arbitrary and capricious, and the Corps must reinitiate consultation.

86.     USACE's decision to conditionally accept the RPA was made under the powerful coercive effect of the 2024 BiOp, which required USACE to take immediate action and states that "USACE is required to notify NMFS of its final decision on the implementation of the RPA." However, the 2024 BiOp's RPA contains several terms and conditions that USACE is incapable of accepting and implementing. For example, many of the criteria that NMFS identifies as necessary for USACE's compliance relate to the ladder design and construction and would require Congressional authorization for major infrastructure modifications. Several actions being required by NMFS pertain to impacts due to conditions under the environmental baseline (e.g., water diversions, existing structures, etc.) or have no nexus with USACE's Proposed Action (e.g., unimpeded volitional passage around Daguerre Point Dam) and therefore USACE has stated it does not have the ability to fully implement them through its O&M of Daguerre Point Dam. Other required actions include specific fish passage management and operations that are within the purview of the resource agencies, such as CDFW, and not within USACE authorities. As a result, USACE cannot implement the RPA as identified in the

2024 BiOp, and its decision to nevertheless accept the RPA was arbitrary and capricious. USACE must reinitiate consultation.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Against NMFS for Violations of the APA and the ESA**
**Request for Declaratory Relief and Injunction Setting Aside the 2024 BiOp**

87.    YCWA realleges and incorporates herein, as if set forth in full, each and every allegation contained in paragraphs 1 through 86, inclusive, of this Complaint and further alleges as follows.

88.    The APA authorizes the court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2)(A); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F.Supp.2d 1247, 1256 (E.D. Cal. 2010) (citing *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 682 (9th Cir. 2007)). An arbitrary and capricious decision arises when the agency "offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *S. Yuba River Citizens League*, 723 F.Supp.2d at 1256 (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

89.    With respect to the ESA, a conclusion and finding of jeopardy is serious and must be based upon the "best available" data, quantitative analysis, sound science, and informed biological decision-making, rather than speculation or unsupported expectation. 16 U.S.C. § 1536(a)(2); *see Nat. Res. Def. Council v. Kempthorne*, 506 F.Supp.2d 322, 329 (E.D. Cal. 2007); *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1158 (9th Cir. 1999). The agency must "articulate a rational connection" between these "best available" data and facts "and the conclusions reached." *S. Yuba River Citizens League*, 723 F.Supp.2d at 1256 (citing *Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1157 (9th Cir. 2006)).

90.    If a biological opinion finds that a proposed agency action will cause jeopardy to an ESA-listed species or result in the adverse modification of its critical habitat, then NMFS is required to suggest RPAs to the proposed action that NMFS believes will not cause jeopardy to the species or result in the adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A). RPAs must be based

on the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2). Before adopting a RPA, NMFS must determine whether: the RPA can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the federal agency's legal authority and jurisdiction, that are economically and technologically feasible, and that would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. 50 C.F.R. §§ 402.02, 402.14(g).

91.    As described more fully above, NMFS's 2024 BiOp is inconsistent with the requirements of both the APA and the ESA because:

    a.   The 2024 BiOp's jeopardy conclusions for listed fish species are arbitrary and capricious.

    b.   The 2024 BiOp's jeopardy conclusion for SRKW is arbitrary and capricious.

    c.   The 2024 BiOp's cumulative effects analysis is substantially flawed and does not support the jeopardy conclusions.

    d.   The 2024 BiOp does not address the errors identified in previous ESA litigation.

    e.   The 2024 BiOp inappropriately redefined the Corps' Proposed Action and discretionary authorities.

    f.   The 2024 BiOp's RPA cannot be fully implemented by USACE.

92.    YCWA has exhausted all administrative remedies required by law and has performed any and all conditions precedent to the filing of this action.

93.    YCWA's interests have been, are, and will continue to be, directly and adversely affected by the NMFS Defendants' failures and unlawful actions that are described in this claim for relief.

94.    YCWA has no plain, speedy or adequate remedy at law and, unless relief is granted as prayed, YCWA's interests will be adversely affected and irreparably injured by the NMFS Defendants' unlawful acts.

WHEREFORE, YCWA prays for relief as more fully set forth below.

/ / /

/ / /

YUBA COUNTY WATER AGENCY'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**SECOND CLAIM FOR RELIEF**

**Against the Corps for Violations of the APA and the ESA**
**Request for Declaratory Relief and Injunction Compelling the Corps to comply with the ESA**

95.    YCWA realleges and incorporates herein, as if set forth in full, each and every allegation contained in paragraphs 1 through 94, inclusive, of this Complaint and further alleges as follows.

96.    Although preparation and issuance of a lawful biological opinion was NMFS's duty, USACE also has a duty under ESA section 7(a)(2) to "use the best scientific and commercial data available."

97.    As explained above, NMFS's 2024 BiOp is legally inadequate. In a letter dated December 19, 2024, the Corps notified NMFS that it disagreed with the 2024 BiOp's jeopardy conclusion. Among other things, the Corps stated that the 2024 BiOp attributed an overly broad scope of effects to the Proposed Action and overstated the Corps' authority and discretion.

98.    Despite its concerns that the 2024 BiOp was not supported by the available scientific information, the Corps notified NMFS that it intended to implement the RPA where it had authority to do so.

99.    By agreeing to implement the RPA despite its concerns that it lacked authority and its reservations about the adequacy of the supporting evidence for the 2024 BiOp, the Corps violated the ESA and the APA.

100.    The Corps' decision to conditionally accept and to begin to implement the RPA should be set aside as an arbitrary and capricious agency action because NMFS's adoption of the 2024 BiOp violated the ESA and the APA. The Corps must reinitiate consultation.

101.    YCWA has exhausted any and all administrative remedies required by law and has performed any and all conditions precedent to the filing of this action.

102.    YCWA's interests have been, are, and will continue to be directly and adversely affected by the Corps Defendants' failures and unlawful actions.

103.    YCWA has no plain, speedy or adequate remedy at law and, unless relief is granted as prayed, YCWA's interests on the Yuba River will be adversely affected and irreparably injured by the Corps Defendants' unlawful acts.

YUBA COUNTY WATER AGENCY'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

WHEREFORE, YCWA prays for relief as more fully set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, YCWA seeks the following relief:

1.      For a judicial declaration that NMFS's issuance of the 2024 BiOp, and the Corps' decision to accept and implement the RPA set forth in the 2024 BiOp, were arbitrary, capricious, and abuses of discretion, not in accordance with law, and in excess of statutory jurisdiction, authority, and limitations;

2.      For an order prohibiting NMFS from relying on the erroneous portions of the 2024 BiOp as precedent in any future ESA consultations, remanding the erroneous portions of the 2024 BiOp to NMFS without vacatur, and requiring NMFS to prepare a new biological opinion that complies with the ESA and any other applicable requirements of law;

3.      For an order prohibiting the Corps from implementing the RPA and requiring the Corps to reconsult with NMFS to prepare a new biological opinion that complies with the ESA and any other applicable requirements of law;

4.      That the court retain jurisdiction over this matter until such time as Defendants have fully complied with the court's orders;

5.      For an award of reasonable attorneys' fees and costs of suit, including expert witness fees; and

6.      For such further and additional relief as the court may deem just and proper.


                                    Respectfully submitted,

Dated: September 2, 2025            REMY MOOSE MANLEY, LLP


                                    By: _____
                                      HOWARD F. WILKINS III

                                    Attorneys for Plaintiff
                                    YUBA COUNTY WATER AGENCY

YUBA COUNTY WATER AGENCY'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF